UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|        Plaintiff, ) | |
| ) | Civil Action No. |
|        v. ) | |
| ) | |
| $50,060 IN UNITED STATES ) | |
| CURRENCY SEIZED FROM ) | |
| JONATHAN MATOS AT LOGAN ) | |
| INTERNATIONAL AIRPORT, ) | |
| EAST BOSTON, MASSACHUSETTS ) | |
| ON MAY 27, 2009, ) | |
|        Defendant. ) | |

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by its attorney, Carmen M. Ortiz, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to 21 U.S.C. § 881(a)(6), alleges that:

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is appropriate pursuant to 28 U.S.C. § 1395.

2. The defendant property consists of $50,060 in United States currency, seized from Jonathan Matos at Logan international Airport, East Boston, Massachusetts on May 27, 2009 (the "Currency").

3. As detailed in the Affidavit of Peter A. Darling, Special Agent with United States Immigration and Customs Enforcement of the Department of Homeland Security, attached hereto and incorporated herein by reference as Exhibit "A", the United States has probable cause to believe that the Currency represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance

or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846 and, therefore, is subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America requests:

1. That a Warrant and Monition, in the form submitted herewith, be issued to the United States Department of Homeland Security for the District of Massachusetts, or his designee, commanding him to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2. That judgment of forfeiture be decreed against the Currency;

3. That thereafter, the Currency be disposed of according to law; and

4. For costs and all other relief to which the United States may be entitled.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney,

By: /s/ Mary B. Murrane
MARY B. MURRANE
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3100
mary.murrane@usdoj.gov

Date: August 22, 2011

<u>Verification</u>

I, Peter A. Darling, Special Agent with United States Immigration and Customs Enforcement of the Department of Homeland Security state that I have read the foregoing Verified Complaint for Forfeiture *in Rem*, and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information, and belief.

                               Peter A. Darling
                               Special Agent
                               United States Department of Homeland Security
                               Immigration and Customs Enforcement

Dated: August 19, 2011


COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                                                                          Boston

Then personally appeared before me the above-named Peter A. Darling, Special Agent with United States Immigration and Customs Enforcement of the Department of Homeland Security, who acknowledged the foregoing to be true to the best of his knowledge, information, and belief, and to be his free act and deed on behalf of the United States of America.

Subscribed to and sworn to before me this 19th day of August, 2011.

                               Lisa J. Talbot
                               Notary Public
                               My Commission Expires: May 13, 2016



LISA J. TALBOT
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
May 13, 2016

**EXHIBIT A**

**AFFIDAVIT OF PETER A. DARLING**

I, Peter A. Darling, being duly sworn, depose and state as follows:

1. I am a Special Agent with United States Immigration and Customs Enforcement of the Department of Homeland Security ("ICE") and have been a Special Agent since 1998. Prior to 1998, I worked for seven years as a Criminal Investigator for the Office of the Attorney General in the Commonwealth of Massachusetts and worked for five years as a Criminal Investigator for the Office of the Secretary of State.

2. During the course of my career with ICE I have received specialized training regarding the activities of narcotics traffickers and various aspects of narcotics investigation, including the methods used to package, transport, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

3. In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers, and have been assigned to narcotics investigations during my employment with ICE. Throughout my career I have participated in hundreds of narcotics investigations as a case agent and in subsidiary roles relating to the distribution of controlled substances, including cocaine, cocaine base ("crack"), heroin, marijuana, diverted prescription pills and other illegal drugs. I personally have participated in all aspects of narcotics trafficking investigations, including but not limited to, supervising narcotics investigations, conducting surveillance, acting in an undercover capacity, using confidential informants, executing arrest, search and seizure warrants, and conducting court-authorized wire interceptions and electronic surveillance. I have debriefed over one hundred defendants, informants, and witnesses who have had personal knowledge about narcotics trafficking activities and the operation of narcotics

trafficking organizations. I have been the affiant on numerous affidavits in support of search warrants, arrest warrants and other court applications.

4. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Specifically, I am familiar with the manner in which narcotics traffickers use air travel, vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.

5. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

> $50,060 in United States currency seized from Jonathan Matos ("Matos") at Logan International Airport, East Boston, Massachusetts on May 27, 2009 (the "=Currency").

6. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

7. This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the Massachusetts State Police ("MSP") involved in the investigation, and my review of records and reports relating to the investigation.

8. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§

841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

### The Investigation

9. Early on the morning of May 27, 2009, Jonathan Matos was at Logan International Airport in East Boston, Massachusetts ("Logan"). Transportation Security Administration ("TSA") personnel discovered that Matos was transporting a large amount of United States currency, which was secreted in the pockets of pants packed in his luggage. TSA contacted the MSP, and Trooper Francis Glasheen ("Trooper Glasheen") arrived at the U.S. Airways main checkpoint at Logan at approximately 5:25 a.m. An initial count of the currency was conducted at Logan, from which law enforcement determined that the amount of currency Matos was transporting was approximately $50,000. Later, a bank count of the currency was conducted and it totaled $50,060 (*i.e.*, the Currency).

10. Matos told Trooper Glasheen that he had recently closed down an automotive sales business, and that he was on his way to Puerto Rico to deposit the money in a bank and to receive a settlement from his recently deceased grandfather's life insurance. Matos said that some of the Currency was withdrawn from bank accounts and some of the Currency was from money that he was saving at his house. Matos said that he did not have any receipts or paperwork with him, but that he could provide documentation.

11. Trooper Glasheen advised Matos that he was seizing the Currency, and that Matos was free to leave, or could accompany Trooper Glasheen to the State Police barracks at Logan (the "Logan Barracks"). Matos chose to go to the Logan Barracks.

12. Trooper Glasheen transported the Currency and Matos to the Logan Barracks, where the Currency was secured. Matos then met with MSP Trooper David Fladger, who

advised Matos that he was not under arrest, and was not being detained. Trooper Fladger told Matos that he would, however, like to have a conversation with him about the Currency, and Matos agreed to speak with Trooper Fladger. Trooper Fladger advised Matos of his rights under *Miranda*, and Matos signed a *Miranda* waiver form. Matos told Trooper Fladger that he understood his rights pursuant to *Miranda*.

13. In this conversation, Matos told Trooper Fladger that the Currency was from his automotive business. Matos said that he sold an average of three to five cars per month in his business and that his customers paid cash for the vehicles. When asked if the Currency was derived from car sales Matos said yes. When Matos was asked why customers paid in cash, and paid with $20 bills, he shrugged his shoulders and said "I don't know."

14. Matos called his girlfriend Jhenny Sanchez and asked her to bring to the Logan Barracks paperwork regarding vehicles sold by Matos, and law enforcement was told that she was enroute.

15. Matos said that his brother Frankie Matos drove him to Logan that morning. But when MSP Lieutenant Coffey spoke with Jhenny Sanchez, she said that she drove Matos to Logan that day.

16. In this conversation, when Trooper Fladger asked Matos if the Currency was withdrawn from a bank, Matos said "no" and that he "kept it at [his] house." Matos again said that he was going to deposit the Currency in a bank in Puerto Rico. When Matos was asked why he would deposit the money in a bank in Puerto Rico, but not in Massachusetts, he said, "I keep it in a safe at my house." Matos also said that he travels back and forth to Puerto Rico "almost monthly" to visit family and friends.

17. Trooper Fladger asked Matos if Jhenny Sanchez was still coming to the Logan Barracks with paperwork regarding Matos's car sales. Matos said "she is not coming." Matos then stated that he wanted to speak with his attorney, and the interview ended.

18. MSP Trooper John J. Morris and his K-9 Rocky conducted a narcotics scan of the Currency. In 2009, Rocky was a three year old Labrador Retriever, and was accredited for narcotic odor detection by the New England State Police Administrators Conference. To conduct the narcotics scan, the Currency was placed in an envelope and put on the floor in a room at the Logan Barracks. Other envelopes of similar size, shape and appearance, which instead contained paper, were also placed on the floor of the room. Rocky conducted a scan and had a positive alert to the envelope containing the Currency, indicating the presence of narcotic odor. Rocky did not alert to any of the other envelopes in the room.

19. An administrative forfeiture proceeding was initiated for forfeiture of the Currency. In connection with that proceeding, Matos submitted an affidavit dated September 16, 2009, in which he said that the Currency was from one multi-vehicle sale transaction to "a Mr. Figeroa of Texas." Matos's affidavit said that in May of 2009 Matos sold Figeroa the last seven cars of his automobile business (which Matos said he was closing) for $55,000. Matos said that Figeroa paid cash for the purchases, mostly in $20 bills.[1] Matos submitted a supplemental affidavit dated November 7, 2009 in which he said that he "assumed Mr. Figeroa was from Texas" but that Matos subsequently "uncovered a document which leads [Matos] to believe that Mr. Figeroa may have been from Colorado not Texas." The document Matos enclosed was a

---

[1] Matos did not file a Form 8300 for this or any other cash transaction in excess of $10,000. Businesses are obligated, pursuant to 31 U.S.C. § 5331, to complete and file such forms for transactions that involved more than $10,000 in coin or currency.

receipt from First Choice Trucking, Inc., of Denver, Colorado, which Matos said picked up one of the seven vehicles sold to Figeroa.

20. In his September 16, 2009 affidavit, Matos says that he did not deposit the proceeds from the sale of vehicles to Figeroa, and instead took the cash to Logan, where he planned to fly to Puerto Rico. According to the affidavit, and in contrast to the interview on the day of the seizure, Matos was then going to use the Currency to pay for the funeral expenses of his grandfather, and start a new business venture called JAM Entertainment, Inc. that would assist "Puerto Rican entertainers obtain jobs in the United States."

21. In support of this affidavit, Matos submitted copies of documents that included among other items the following:

（i） a 2008 used car dealer license for Matos Auto Sales, Inc. (which expired January 1, 2009, five months before the purported sale of vehicles to Figeroa);

(ii) Articles of Organization from 2007 for Matos Auto Sales, Inc.,

(iii) Articles of Organization for JAM Entertainment, Inc. from 2009 (which does not make any reference to Matos and lists Jhenny Sanchez as President, Treasurer, Secretary and sole Director); and

(iv) bank statements from 2008 for Matos Auto Sales that detail transactions which are inconsistent with the business history Matos describes in his affidavit.

22. Matos did not provide any bills of sale for any vehicles, any information regarding vehicle identification numbers of the automobiles he purportedly sold, copies of any titles for vehicles, or any other receipts for transport of the other six vehicles Matos said he sold to Figeroa.

23. Based on my training and experience, I know that drug transactions are cash transactions and that those involved with the illegal narcotics business may carry significant amounts of cash. I further know that those who traffic in narcotics often transport significant amounts of cash by air travel, as well as other methods of travel. Narcotics traffickers may make regular trips to and from source cities to transport payment for and proceeds of narcotics. In

addition, those involved in the illegal narcotics business may establish "straw" businesses whose sole, or primary, purpose is to provide the appearance of a legitimate source for funds that are drug proceeds.

24.   Matos has previously been convicted of narcotics violations. On June 1, 2006 Matos was found guilty on two counts of possession of cocaine by a jury sitting in the United States District Court for the District of Massachusetts (Criminal No. 04-10237-NG).

## Conclusion

25.   Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this 19th day of August 2011.

Peter A. Darling, Special Agent
United States Immigration and Customs
Enforcement,
Department of Homeland Security